IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian Ganley,                             :
                         Petitioner       :
                                          :
            v.                            : No. 770 C.D. 2024
                                          : Argued: March 4, 2025
Upper Darby Township (Workers'            :
Compensation Appeal Board),               :
                         Respondent       :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE STACY WALLACE, Judge (P.)
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE WALLACE[1]                            FILED: October 22, 2025

        Brian Ganley (Claimant) petitions for review of the Workers' Compensation
Appeal Board's May 30, 2024 order (Order) affirming the Workers' Compensation
Judge's (WCJ) decision and order (Decision) denying Claimant's claim for benefits
for a work injury in the nature of post-traumatic stress disorder (PTSD) under the
Workers' Compensation Act[2] (Act).  After review, we reverse.

                                   **BACKGROUND**

        The WCJ made the following material findings of fact.  *See* Certified Record
(C.R.) at 20-33.[3]  Upper Darby Township (Employer) employed Claimant as a

---

[1] This matter was reassigned to the authoring judge on September 18, 2025.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[3] References to the certified record reflect electronic pagination.

firefighter from 2001 until May 2021,[4] when he took a medical leave of absence. In his final two and one-half years as a firefighter, Claimant twice experienced events in which he performed cardiac pulmonary resuscitation (CPR) on infants who were not breathing, both of whom he was unable to revive. During the first event, in November 2018, Claimant responded to a report of cardiac arrest for a two-week-old infant. Claimant performed CPR on the infant, assisted by paramedics. Despite Claimant's efforts, he was unable to bring the baby back. Claimant continued to work for Employer but suffered from mental issues related to the first incident. During the second event, in May 2021, a father brought a nine-month-old infant who was not breathing into the fire station. Claimant and co-workers performed CPR on the nine-month-old baby, who was not revived. After the second incident, Claimant's mental health symptoms intensified, and he left his duties as a firefighter.[5] As a result of these two incidents, Claimant experienced mental issues including anxiety, depression, anger, PTSD, loss of appetite and sleep, and nightmares. Claimant stopped working as a firefighter because of these symptoms.

During his career, Claimant, who was an emergency medical technician (EMT), received infant, child, and adult CPR training. Additionally, Claimant administered CPR numerous times to adults, some of whom were not revived. Notably, except for these two incidents, Claimant never had to perform CPR on any other infant, and no other infant or baby died in his presence.

The parties did not dispute Claimant suffered PTSD because of his work-related duties as a firefighter. The dispute was whether the causal events amounted

---

[4] Claimant began working as a volunteer firefighter for Employer as a teenager, and he continued until he was hired as a paid firefighter in 2001.

[5] Claimant testified he was using sick leave as of July 2023.

to abnormal working conditions. The parties presented conflicting evidence on this issue. In support of his claim, Claimant presented the testimony of Donald Konkle (Konkle), Peter Huf (Huf), and Gladys Fenichel, M.D. (Dr. Fenichel), a psychiatrist who reviewed Claimant's records and examined Claimant for litigation purposes.

Konkle served as a career firefighter for 33 years, co-chaired the Pennsylvania Fire Service's legislative committee, and was a member of the Pennsylvania Task Force I, a federally certified search and rescue group. The WCJ summarized Konkle's testimony in detail, which included, *inter alia,* the following: the death of a child is fairly rare and extremely traumatic; the deaths of two infants in a short period of time were abnormal; the direct acceptance of care from a parent was abnormal; and the death of someone in a firehouse is extremely rare.

Huf, a firefighter for Employer, worked alongside and supervised Claimant. He began his service as a volunteer firefighter in 1983 before becoming a career firefighter between 1987 and 2020, a captain in 2000, and a deputy chief in 2014. Huf testified a firefighter's performance of CPR on an infant and an infant's death are rare events and he was unaware of any other firefighter, besides Claimant, who performed CPR on an infant and experienced the death of that infant. Huf indicated during his years of service, instances of infant fatalities from fire or smoke inhalation have occurred on occasion. Additionally, Huf testified he had seen the administration of CPR to young children and Claimant was trained to administer CPR, including to infants. Additionally, he indicated individuals came into the fire station to seek assistance. Huf indicated Claimant's handling of the incidents was normal and expected, and that he acted in accordance with his training.

Employer presented the testimony of Derrick Sawyer (Sawyer), Employer's fire chief. At the time of the hearing, Sawyer had served as a firefighter for 36 years.

3

He had served areas including Philadelphia, where he was a fire commissioner, and Trenton, New Jersey, where he was a fire director, before becoming Employer's fire chief in 2020. Sawyer testified Employer's firefighters are required to obtain certification in CPR at two-year intervals, including specialized training for infants; all Employer's firefighters are required to get EMT certification; a firefighter would start CPR on an individual at a scene until transferring care to paramedics with a higher level of training when they arrive; and the success rate for survival of an individual after administration of CPR is low. Sawyer testified Claimant had EMT training. Sawyer testified the performance of CPR is an essential duty for which Claimant was hired and that the involvement of an infant or young child doesn't create an "abnormal event." C.R. at 26. However, he also admitted having to perform CPR on a child under five years of age is rare. Sawyer noted firefighters might encounter infants or children in distress at the scene of a fire. Sawyer testified that during his career, persons of all ages have died of smoke inhalation from fires; individuals come to a fire station for medical reasons; and firefighters perform CPR on individuals who are not revived.

Sawyer testified Claimant's administration of CPR to the two infants was a "normal" part of a firefighter's job. Specifically, Sawyer indicated: "If we're called to an emergency scene[,] I would think that would be normal to perform CPR on an unresponsive patient." *Id.* at 228. Additionally, regarding Claimant's performance of CPR, Sawyer had the following exchange:

> Q: Chief, as part of the firefighter duty, they are trained and are expected to administer CPR to infants or adolescents if . . . the need arise[s], correct?
>
> A: Yes' ma'am
>
> . . . .

4

Q: That's not something outside the scope of employment expectations, correct?

A: Absolutely not. Matter of fact, it[']s part of your duty once you've been trained and you've sworn in to be a firefighter.

. . . .

Q: The act of trying to assist and provide CPR to that child until paramedics arrive, is that something that you would consider abnormal or normal?

A: I would consider that an expectation of the job. If you encounter a person in distress, . . . you're trained to perform CPR. Matter of fact, if he did [not] perform CPR, I would consider that . . . making the organization liable for not performing the duties that [we] are hired to do. Once you come across a patient that's unresponsive, your job is to perform CPR until care arrives[,] and it needs to be transferred.

*Id.* at 230, 232-33. Regarding the specific circumstance of performing CPR on an infant and having that infant die, Sawyer testified as follows:

Q: In a setting of the experience of a firefighter and a firefighter like you or like [Claimant], if you look at all the shifts that you've worked, all the [shifts] that [Claimant] worked in 19 years, having your hands on an infant and performing CPR and having that infant die is a rare thing, correct?

A: Doesn't happen often.

Q: Would you agree with me that it's rare?

A: I think so.

*Id.* at 255. Sawyer also testified that he initiated the Critical Incident Stress Decreasement Team after Claimant's second event providing CPR to the infant child. Sawyer stated Employer did a briefing "within hours after that incident," and

5

Sawyer recalled coming to work around four in the morning for the briefing because "of the sincere nature of that [i]ncident." *Id*. at 241-42.

Sawyer reviewed Konkle's testimony and disagreed with Konkle's opinion that the episodes in November 2018 and May 2021 were "extremely abnormal." *Id*. at 238. Sawyer explained that "people die every single day in fire service in our communities, because people die with gun violence, because death isn't abnormal in our society nowadays, and because death is a normal occurrence in our everyday life." *Id*. at 238. Sawyer testified that during his time as fire chief for Employer, the department had two fire fatalities, both of whom were adults. He testified that over the course of his 36 years in fire service, which included his service in Philadelphia and New Jersey, he had "children die, teenagers die, adult[s] die, older adult[s] die." *Id*. at 224. Sawyer testified he encountered more than one occasion where firefighters administered CPR to an infant who could not be resuscitated, and that he himself had administered CPR to an infant or young child who did not return to life. When asked whether he agreed with Konkle's testimony that a civilian death is rare, Sawyer responded he did not agree because:

> Death is not rare. If you look at the fire statistics at the National Fire Academy, we lose thousands and thousands of civilians every year. My humble opinion is that death is not rare. That's my humble opinion. One fire death is one too many, I agree with the seriousness of nature of people dying, but it's not rare for people to die. People die every single day in this world.

*Id*. at 239-40. Despite this testimony, when asked specifically about Upper Darby, Sawyer testified that civilian deaths in fires and fire responses are rare.

The WCJ resolved the conflicts in testimony on the key issue of whether the incidents experienced by Claimant were rare or unusual in favor of Sawyer, whom he found "totally credible." *Id*. at 28. The WCJ found Konkle credible as to most

of his testimony, but the WCJ specifically noted he did not find Konkle credible "about the 'extremely abnormal' [two] events with [Claimant's] involvement with [two] infants because [Sawyer] credibly refuted that." *Id*. at 27-28. Additionally, the WCJ found much of Huf's testimony credible, except he found Huf was not credible "that an 'abnormal occurrence' in fire service is a situation during which a firefighter encounters [two] lifeless babies, then unsuccessfully puts his hands on them, and performs CPR on them in a 16-month time period. He's not credible with respect to the aforesaid because [Sawyer] credibly refuted the alleged abnormality of that situation for firefighters." *Id*. at 28. Based upon these findings, the WCJ reached the legal conclusion that Claimant did not establish the causative events were abnormal. The WCJ noted: "The facts that the Claimant admits that he was provided with training with respect to the administration of CPR and was an EMT and that [Sawyer] testified that CPR training involves CPR on infants and adults show that the administration of CPR was a normal part of [Claimant's] job and cannot be considered an abnormal working condition." *Id*. at 27. The WCJ found Claimant did not establish he was subject to conditions unlike those to which an employee in his position was normally subjected and did not establish the events at issue were not normally experienced or anticipated by employees in Claimant's line of work. The WCJ stated: "Situations like the instant ones, although traumatic, are simply not extraordinary or abnormal for first responders." *Id*. at 32. Based on this determination, the WCJ denied Claimant's claim petition. Claimant appealed the WCJ's decision to the Board, which affirmed.

Claimant now appeals to this Court. On appeal, Claimant presents two issues:

> [1.] Whether the [d]ecisions of the Board and WCJ that the death of two infants after [Claimant] unsuccessfully performed CPR on them is a normal working condition for

7

a [f]irefighter in Pennsylvania is consistent with controlling authority and supported by competent evidence?

. . . .

[2.] Whether the [d]ecisions of the Board and WCJ are inconsistent with the humanitarian purposes of the [ ] Workers' Compensation Act?

Claimant's Br. at 5.

## DISCUSSION

This Court reviews workers' compensation orders for violations of a party's constitutional rights, violations of agency practice and procedure, and other errors of law. 2 Pa.C.S. § 704. We also review whether substantial evidence supports the findings of fact necessary to sustain the Board's decision. *Id.* When it comes to questions of credibility and acceptance of evidence, the WCJ is the ultimate fact finder in workers' compensation cases and is entitled to weigh the evidence and assess credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citation omitted). This Court will not disturb a WCJ's findings so long as there is substantial evidence in the record to support those findings. *Berardelli v. Workmen's Comp. Appeal Bd. (Bureau of Pers. State Workmen's Ins. Fund)*, 578 A.2d 1016, 1018 (Pa. Cmwlth. 1990).

In psychological injury cases, the issue of whether a claimant has established abnormal working conditions must be "evaluated on a case-by-case basis." *Id*. (citation omitted). While psychological injury cases are highly fact-sensitive and require deference to the fact-finding functions of the WCJ, whether a claimant has established "abnormal working conditions" is a question of law fully reviewable on appeal. *Payes v. Workers' Comp. Appeal Board (Pa. State Police)*, 79 A.3d 543 (Pa.

8

2013) (citations and quotations omitted); *Premium Transp. Staffing, Inc. v. Welker*, 305 A.3d 1212, 1221(Pa. Cmwlth. 2023).   Regarding questions of law, our standard of review is *de novo*, and our scope of review is plenary.  *Sedgwick Claims Mgmt. Servs., Inc. v. Bureau of Workers' Comp., Fee Rev. Hearing Off. (Piszel & Bucks Cnty. Pain Ctr.)*, 185 A.3d 429 (Pa. Cmwlth. 2018).  In other words, we consider the case anew, *see Manor v. Department of Public Welfare*, 796 A.2d 1020, 1029 (Pa. Cmwlth. 2002) (citation omitted), and we may review the entire record.  *Probst v. Dep't of Transp., Bureau of Driver Licensing*, 849 A.2d 1135 (Pa. 2004).  Finally, in reviewing issues concerning the Act, we are mindful the Act is remedial in nature and its purpose is to benefit the workers of the Commonwealth.  *Tooey v. AK Steel Corp.*, 81 A.3d 851, 858 (Pa. 2013).  Accordingly, we construe the Act liberally to effectuate its humanitarian objectives, and we resolve borderline interpretations in the injured party's favor.  *Id.* (citation omitted).

To recover workers' compensation benefits, a claimant bears the burden of proving all necessary elements to support an award of compensation, namely that the alleged injury is both work related and disabling.  *Premium Transp.*, 305 A.3d at 1217 (citations omitted).  For a psychological injury caused by a mental stimulus, or a "mental/mental" injury,[6] a claimant must prove his employment caused his psychological injury.  *Ryan v. Workers' Comp. Appeal Bd. (Cmty. Health Servs.)*, 707 A.2d 1130 (Pa. 1998).  Additionally, a claimant's psychological injury cannot merely be his "subjective reaction to normal working conditions."  *Premium*

---

[6] The Act sorts psychological injuries into three categories: "(1) the 'mental/physical' injury where a psychological stimulus causes a physical injury; (2) the 'physical/mental' injury where a physical stimulus causes a psychic injury; and (3) the 'mental/mental' injury where a psychological stimulus causes a psychic injury." *Ryan v. Workers' Comp. Appeal Bd. (Cmty. Health Servs.)*, 707 A.2d 1130, 1133-34 (Pa. 1998) (quoting *Volterano v. Workmen's Comp. Appeal Bd. (Allied Corp.)*, 639 A.2d 453, 457-58 (Pa. 1994)).

*Transp.*, 305 A.3d at 1217. Instead, a claimant must prove an "abnormal working condition" caused his psychological injury. *Ryan*, 707 A.2d at 1135 (citing *Martin v. Ketchum, Inc.*, 568 A.2d 159, 164-65 (Pa. 1990)).

Our consideration of this issue begins with reviewing the development of our law regarding compensable psychological injuries. Before 1972, the Act's definition of "injury" required "violence to the physical structure of the body." *Martin*, 568 A.2d at 163. With its 1972 amendment to the Act, the legislature altered the definition of "injury" to include "an injury to an employee, regardless of his previous physical condition, arising in the course of his employment and related thereto." *Id*.; 77 P.S. § 411. Relying on the amendment, the Pennsylvania Supreme Court held mental illness, which under the previous definition of "injury" was not cognizable under the Act, could be a compensable injury. *Martin*, 568 A.2d at 164 (citation omitted). In doing so, however, the Court recognized the difficulty in establishing causation in psychological injury cases because such conditions are subjective in nature. *Id*. Consequently, the Supreme Court held that claimants seeking benefits for psychological injuries must meet a higher burden for causation by proving a psychological injury is more than a subjective reaction to normal working conditions, in other words, that the psychological injury was caused by "abnormal working conditions." *Id*. at 165.

In *Payes*, 79 A.3d at 550-52, the Pennsylvania Supreme Court outlined the following relevant history detailing the development of the "abnormal working conditions" requirement:

> [T]he "abnormal working conditions" requirement was instituted because this Court, and the Commonwealth Court previously, recognized the need to distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability has been established, from those

10

psychiatric injuries that arise from the employee's subjective reactions to normal working conditions. As we observed in the context of a direct challenge to the requirement that a claimant must prove abnormal working conditions:

> Abandoning the distinction between normal and abnormal working conditions . . . would eliminate the element of causation. It would destroy the fundamental principle underlying the scheme of the [Workers'] Compensation Act-that, in order to be compensable, an injury must be work[ ]related. . . . [Otherwise,] a claimant would have to establish only that the employee suffered from a mental illness while employed and that the illness was a condition created or aggravated by that employee's **perception** of the conditions of his employment. That would reduce [workers'] compensation benefits to nothing more than a disability or death benefit payable only because of the employee status of the claimant-and not because the injury was caused by his employment.

*Martin*, [568 A.2d at] 165 (emphasis added).

Since *Martin* (the foundational decision of this Court in this field), "[w]e have consistently rejected the argument that proof that a psychic injury was caused by normal working conditions establishes a compensable injury under the Act." *Davis v. Workers' Compensation Appeal Board (Swarthmore Borough)*, . . . 751 A.2d 168, 177 ([Pa. ]2000). . . . Indeed, [in *Davis*,] we observed:

> *Martin* and its progeny reflect the view that there is a degree of uncertainty inherent in any employment situation, as in life itself, such that an employee's individual, subjective reaction to . . . **ordinary vicissitudes** is not the type of condition which the legislature intended to require compensation for because it is not, in the common understanding, an injury.

*Davis*, [751 A.2d] at 177 (emphasis added).

Moreover, "even if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he [or she] can recover." *Hershey Chocolate* [*Co. v. Workmen's Comp. Appeal Bd. (Lasher)*, 682 A.2d 1257, 1260 (Pa.

11

1996)] (quoting *Wilson*[ *v. Workmen's Comp. Appeal Bd. (Aluminum Co. of Am.)*, 669 A.2d 338, 344 (Pa. 1996))].

. . . .

With respect to the requirement that mental injuries "be considered in the context of specific employment," *Wilson*, [669 A.2d at] 343, we have stated as follows:

> In classifying working conditions as normal or abnormal, we do not employ a bright line test or a generalized standard, but instead, consider the specific work environment of the claimant; for we recognize that what may be normal for a police officer will not be normal for an office worker. Consequently, we deny compensation for injuries resulting from events that **are expected** in the relevant working environment, whether it is an office worker's change in job title or responsibility . . . or a police officer's involvement in life-threatening situations.

*RAG*[ *(Cyprus) Emerald Res., L.P. v. Workers' Comp. Appeal Bd. (Hopton)*, 912 A.2d 1278, 1288 (Pa. 2007)] (citations omitted; emphases added).

*Payes*, 79 A.3d at 550-52 (some internal citations and quotation marks omitted; emphasis in original).

When addressing cases involving psychological injuries, we have recognized some jobs are, by their nature, highly stressful. *See Young v. Workers' Comp. Appeal Bd. (New Sewickley Police Dep't)*, 737 A.2d 317, 320 (Pa. Cmwlth. 1999). While Pennsylvania case law emphasizes psychological injury cases are highly fact dependent in conjunction with a claimant's particular occupation, the Supreme Court has also indicated this "does not mean that the abnormal-working-conditions analysis ends when it is established that the claimant generically belongs to a profession that involves certain levels or types of stress." *Payes*, 79 A.3d at 555. The Court noted that to hold otherwise would put too much emphasis on a court or tribunal's determination regarding the "quantity or quality of stress an employee

12

should be able 'to take,' or what episode of stress is, in the tribunal's [or court's] subjective determination, comparable to a different episode of stress, which may be expected to be tolerated by an employee." *Id*. By way of example, the Supreme Court noted "although police officers may expect to receive threats from criminals during the course of their careers, this does not mean as a matter of law, all types and manners of threats may be anticipated in the course of an officer's duties, again, emphasizing the highly fact-sensitive nature of the inquiry." *Id*. (internal quotation marks and citation omitted). A high-stress working environment constitutes a legally sufficient abnormal working condition where there is

> a finding either that [the] claimant's work performance (as distinguished from a mere job description) was unusually stressful for that kind of job or a finding that an unusual event occurred making the job more stressful than it had been.

*Young*, 737 A.2d 317.

In *Payes*, the Supreme Court held a state trooper demonstrated an abnormal working condition existed and he was entitled to benefits for a psychological injury which occurred after he accidentally struck and killed a pedestrian with his police car and simultaneously attempted to revive her and to divert traffic from hitting them. 79 A.3d at 556-57. The Court noted the facts found by the WCJ established the existence of "an extraordinarily unusual and distressing single work-related event" experienced by Claimant, which resulted in his disabling mental condition, where "such single and comprehensive work-related event constituted an abnormal working condition as a matter of law." *Id*.

In *Pennsylvania Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz)*, 108 A.3d 922 (Pa. Cmwlth. 2014), this Court addressed a challenge to a WCJ's award of benefits for a psychological injury caused by

13

abnormal working conditions, when a liquor store manager suffered PTSD after being robbed at gunpoint. Initially, this Court relied on the claimant's training on workplace violence, noting that some training and pamphlets specifically related to robberies and theft, which the claimant had attended, as well as evidence that 99 robberies at retail stores occurred near the claimant's store within weeks of the armed robbery there, to conclude the claimant could have anticipated being robbed at gunpoint at work and, therefore, the armed robbery of his store was a normal condition of his retail liquor store employment. *Id*. at 926. The claimant appealed to the Supreme Court, and the Court remanded the case to this Court for reconsideration in light of its decision in *Payes*, noting the highly fact-sensitive nature of psychological injury cases. *Id*. at 926-27. In reconsidering this issue and taking *Payes* into account, this Court explained:

> At issue is whether, because [the claimant] had received training involving workplace violence and because robberies had occurred at [the employer's] other locations, the WCJ erred in finding the armed robbery [the claimant] experienced to have been "an abnormal working condition." The employer in *Payes* . . . also presented evidence regarding the training that the claimant, a state trooper, received related to managing stress, responding to automobile accidents, and rendering first aid to victims at a crash site, as well as evidence that state troopers are exposed to automobile accidents and another state trooper had struck and killed a pedestrian who ran in front of his patrol vehicle. *Payes* . . . , 79 A.3d at 546. The WCJ in *Payes* . . . credited that testimony. *Id*. Nevertheless, notwithstanding the training and other occurrences regarding fatal automobile accidents, our Supreme Court held that the incident that caused the claimant's PTSD was *"a singular extraordinary event" for this particular trooper* and, therefore, that incident constituted an abnormal working condition. *Id*. at 553. Our Supreme Court indicated that the employer's evidence that another "state trooper had once struck a pedestrian [did] not make the incident here a 'normal' working condition" as "[a]bnormal working conditions need not be 'unique' working conditions." *Id*. at 556 n.8.

14

*Kochanowicz*, 108 A.3d at 932 (emphasis added). Ultimately, this Court determined that although the claimant in *Kochanowicz* received training on workplace violence, and robberies had occurred at other liquor stores, "such training was not entirely relevant, and not dispositive, of whether the armed robbery [the c]laimant experienced was a normal working condition." *Id.* at 933. Additionally, we noted the WCJ's findings described "a singular, extraordinary event occurring during [the claimant's] work shift" that caused the claimant's PTSD, and those findings supported "the WCJ's legal conclusion that [the claimant] established that the specific armed robbery here was not a normal working condition." *Id.* at 934. Both *Payes* and *Kochanowicz* highlight the fact-sensitive nature of the abnormal working condition analysis and emphasize that we must consider all circumstances surrounding the causative event leading to the claimant's psychological injury.

Here, the WCJ found Claimant proved he "suffered an injury and resultant disability from his working conditions." C.R. at 32. However, the WCJ determined Claimant did not establish the causative working conditions at issue were "abnormal." *Id.* In making this finding, the WCJ credited Sawyer's testimony that the events Claimant experienced were not "abnormal."[7] *Id.* at 28. However, we note the WCJ's determination that Claimant did not endure an "abnormal working condition" constituted a conclusion of law, which is subject to our *de novo* standard of review. Given our standard of review, we recognize while we accept the WCJ's supported factual findings, we are not bound by the WCJ's legal conclusions. Thus, we consider whether, based on the facts found by the WCJ, an abnormal working

---

[7] A witness's use of the very word that is to be determined by the decision-maker, in this case the WCJ, should be met with some level of scrutiny. As to whether the working condition was abnormal was a legal conclusion to be determined by the WCJ. The legal conclusion should be drawn from the facts, not impermissibly bootstrapped into becoming a fact.

15

condition caused Claimant's PTSD, or whether Claimant's subjective reactions to normal working conditions caused his injury.

Upon review of Sawyer's testimony as a whole, Sawyer's opinion that Claimant's experience was not "abnormal," an opinion on which the WCJ relied, was an opinion Sawyer based on his assertion that death, in general, is not an abnormal event because, as he indicated, "people die every single day." *Id*. at 238. In essence, Sawyer opined Claimant's experience was not abnormal because death is an unavoidable part of life. While this may be true, it does not directly address whether Claimant experienced "abnormal" working conditions. Moreover, Sawyer testified Claimant's experience of administering CPR to the two infants was "normal" because it "would be normal to perform CPR on an unresponsive patient." *Id*. at 228. Consistent with Sawyer's testimony, we agree that standing on its own, performing CPR on an individual, witnessing death, or responding to an emergency involving a child, might each be an unfortunate but expected working condition for a firefighter. However, we must consider the specific factual scenario faced by Claimant, and we do not do so by looking to "unrelated component parts, where each part, standing on its own, might be safely determined to be a 'normal' working condition." *See Payes*, 79 A.3d at 582. Such a review would render our discussion a "potentiality with no relation to what happened in this case." *Id*. at 583.

The reality of Claimant's situation was that he performed CPR on and witnessed the deaths of two infant children within a 16-month period.[8] It was the

---

[8] While the WCJ found "the baby died at a hospital," *see* C.R. at 23, we presume the WCJ simply meant the baby was officially pronounced deceased at the hospital. Under the Uniform Determination of Death Act, Act of December 17, 1982, P.L. 1401, 35 P.S. §§ 10201-10203, an individual is deceased if they have experienced "irreversible cessation of circulatory and respiratory functions." Section 3 of the Uniform Determination of Death Act, 35 P.S. § 10203. It is clear that CPR was administered unsuccessfully on the baby before it arrived at the hospital. **(Footnote continued on next page…)**

16

compounded effect of these two incidents that caused Claimant's disabling PTSD. There can be little doubt that firefighters experience a high amount of stress in their jobs. Nonetheless, we must recognize that certain events, even in high-stress professions, may rise to the level of abnormal working conditions. Claimant did not simply witness death at a usual call involving a fire or a motor vehicle crash. Claimant was actively involved in attempting to resuscitate two separate unresponsive babies and witnessing each of their deaths. We cannot agree that Claimant's experience in this regard was a "normal" or "expected" consequence of being a firefighter. Indeed, in Claimant's 20 years' experience in firefighting service before the first event, Claimant had never before had to perform CPR on an infant. There is no evidence in the record that suggests firefighters in Upper Darby or even in Pennsylvania routinely or normally perform CPR on infant children or witness the deaths of infant children. Furthermore, it is noteworthy that of the three instances in which Employer called upon the county's Critical Incident Stress Decreasement Team between 2018 and 2022, two of those calls were in response to these two incidents involving Claimant and the infants. *Id*. at 251-52. Certainly, this highlights both the rarity of these events and the potential for substantial psychological impact to the participants, which is further magnified by the fact that the same person, Claimant, administered CPR on infants on each occasion.

Moreover, even though Sawyer testified he has performed CPR on an infant, this does not make the incident faced by Claimant a "normal" working condition. As the Supreme Court outlined in *Payes*, we must consider whether the incident that

---

This understanding is consistent with Claimant's testimony. When asked if the baby he was trying to resuscitate "pass[ed] away there" or "at the hospital," he said that the baby "was dead there, but they brought her to the hospital and pronounced her [dead] at the hospital." *Id*. at 125.

caused Claimant's PTSD was "a singular extraordinary event" for *this particular* firefighter. Certainly, Claimant's performance, within a 16-month time period, of CPR on two infants who were not revived constituted an "extraordinary event" and, therefore, an abnormal working condition. While two distinct incidents were involved, the culmination of the two in a short period created the sequence. The sequence then became the extraordinary event.[9] Claimant's development of disabling PTSD after the sequence was not a "subjective reaction to normal working conditions." *Premium Transp.*, 305 A.3d at 1217. This conclusion is consistent with the record, including Sawyer's testimony, which the WCJ found "totally credible," that the performance of CPR on any child under five years of age is, in fact, rare. If the performance of CPR on a child under five years of age is rare for a firefighter, then certainly the performance of CPR on two infants within 16 months of one another is abnormal. Moreover, the WCJ concluded, based on Claimant's CPR training, "that CPR training involves CPR on infants and adults show that the administration of CPR was a normal part of . . . Claimant's job and cannot be considered an abnormal working condition." C.R. at 28. However, while the anticipation of, or training for, a workplace hazard is relevant to the analysis in a claim of abnormal working conditions, neither is dispositive. *See Premium Transp.*, 305 A.3d at 1220. Although the record demonstrates Claimant received training on how to respond to emergency situations, including infant CPR training, this general training, in and of itself, is insufficient to support a conclusion Claimant should have anticipated a sequence of performing CPR on infants, who did not survive, within 16 months of each other. While relevant, Claimant's training is not dispositive. *See*

---

[9] By way of analogy, a baseball or soccer tournament may include a series of three games. Each game is an event, but the tournament itself can also be considered a singular event.

18

*id*. Claimant proved the conditions he faced were unusually stressful when compared to the usual working conditions of firefighters.[10]

## CONCLUSION

We conclude, as a matter of law, that the facts found by the WCJ establish the existence of an extraordinarily unusual and distressing combination of events experienced by Claimant which resulted in his disabling mental condition. The package of these tragedies, and Claimant's direct involvement in them, constitutes an abnormal working condition. Accordingly, we hold the Board erred as a matter of law by failing to conclude that the facts found by the WCJ established the existence of an abnormal working condition.

---

[10] We note that the abnormal working condition analysis is a creature of case law and a laudable, yet imperfect attempt "simply to ensure that the Act's requirements that compensable injuries are truly work-related and objectively established are met." *Payes*, 79 A.3d at 585 (citation omitted). Here, there is no dispute Claimant suffered disabling PTSD because of this work-related sequence, and thus, Claimant's injury is "objectively established" and "work[ ]related." Moreover, this Court concludes that under the abnormal working condition analysis as applied in this case, Claimant established an "abnormal working condition" by the compounded tragedy of twice having to attempt to resuscitate and witness the deaths of infant children within a 16-month timespan. Nevertheless, we recognize the potential challenge for first-responder claimants to prove that their work-related psychological injuries are "abnormal" working conditions when their working conditions often involve facing traumatic events. In response to this issue, the legislature has enacted Section 301(g) of the Act, added by the Act of October 29, 2024, P.L. 1079, No. 121, § 2, **effective October 29, 2025**, which specifically addresses claims for post-traumatic stress injuries suffered by first responders. Section 301(g) of the Act provides a claim for a PTSD injury suffered by a first responder who undergoes a qualifying traumatic event sustained in the course and scope of his employment as a first responder and, notably, indicates the injury "shall not be required to be the result of an abnormal working condition to be a compensable injury." 77 P.S. § 415.

19

Therefore, we reverse the Board's Order affirming the WCJ's denial of Claimant's claim petition and remand the matter to the Board to remand to the WCJ for further proceedings consistent with this Opinion. Specifically, the matter is remanded for the calculation of an award of disability benefits associated with Claimant's work injury and attorney's fees.

_____
STACY WALLACE, Judge

Judge Dumas did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian Ganley, : 
                   Petitioner : 
                    : 
       v. : No. 770 C.D. 2024
                    : 
Upper Darby Township (Workers' : 
Compensation Appeal Board), : 
            Respondent : 

# **O R D E R**

**AND NOW**, this 22nd day of October 2025, the May 30, 2024 order of the Workers' Compensation Appeal Board is **REVERSED**, and this matter is **REMANDED** to the Workers' Compensation Appeal Board with the direction that it remand the matter to the Workers' Compensation Judge for further proceedings consistent with this Opinion.

Jurisdiction relinquished.

_____
STACY WALLACE, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian Ganley,                                    :
                   Petitioner        :
                                         :
         v.                              :    No. 770 C.D. 2024
                                         :    ARGUED: March 4, 2025
Upper Darby Township (Workers'                   :
Compensation Appeal Board),                      :
                   Respondent        :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE STACY WALLACE, Judge (P.)
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**CONCURRING OPINION BY**
**SENIOR JUDGE LEADBETTER**                **FILED:  October 22, 2025**

I fully agree with the well-reasoned opinion of the majority. I write separately simply to note my view as to the continued viability of the "abnormal working conditions" doctrine. As noted by the majority, since 1972, Section 301(c)(1) of the Workers' Compensation Act has provided that, "An injury to an employee [is compensable], regardless of his previous physical condition, arising in the course of his employment and related thereto." Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1). Nonetheless, for decades we have required that a claimant who suffers a disabling *mental* injury must show not only that it was caused by his or her employment, but also that the cause sprang from some "abnormal" working condition(s). In other words, in contrast to the physical injury paradigm, a claimant with a more fragile pre-injury mental state is treated less favorably than his or her more resilient colleagues because he or she has had a "subjective" reaction to the event. We understand mental injuries better today than we did even a few decades

ago and ancient prejudices borne of lack of understanding are outdated and wrong. I would posit that all emotional reactions to disturbing events are "subjective" even though some reactions are more severe than others.

From the beginning, the "abnormal working conditions" doctrine has been unworkable, causing courts to struggle to draw elusive distinctions concerning what is normal or expected in any given line of work based on highly specific factual details, and too often based on anecdotal testimony regarding the perceived frequency of such incidents. What may be a "normal" experience for a police officer or a school teacher or a cashier in Philadelphia may be quite rare for such a professional in suburbia or rural areas, but the traumatic injuries can be the same and are no less real or disabling than physical injuries merely because we cannot see them. It seems to me that refusing to compensate a substantial proven injury is antithetical to the humanitarian purposes of the Act.

In short, while we are certainly bound by the precedents cited by the majority, I believe it is time to scrap the "abnormal working conditions" doctrine altogether and hold that if there is clear proof of a disabling work-related mental injury, it should be compensable.[1]

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

---

[1] As noted by the majority, the General Assembly has abrogated this rule for first responders, with certain restrictions. *See* majority opinion at n.10, p.19. As this case illustrates, this is a salutary change in the law. However, I believe any workers experiencing mental disabilities from traumatic workplace events should be treated in the same manner and, since the "abnormal working conditions" restriction is a judge-made rule, the courts should eliminate it.